UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Edward Charles McDonald,

       Plaintiff,

v.                                                             Civil No. 09-908 (JNE/FLN)
                                                                ORDER

City of Saint Paul and
Mayor Christopher B. Coleman,

       Defendants.

---

Michael A. Fondungallah, Esq., Fondungallah & Kigham, LLC, appeared for Plaintiff Edward Charles McDonald.

Louise Toscano Seeba, Esq., Saint Paul City Attorney's Office, appeared for Defendants City of Saint Paul and Mayor Christopher B. Coleman.

---

      Edward Charles McDonald was a finalist for the position of Director of the City of Saint Paul's Department of Human Rights and Equal Economic Opportunity. After the City Council had confirmed Mayor Christopher B. Coleman's selection of another candidate for the position, McDonald brought this action against the City and the Mayor (collectively, Defendants). He asserts claims under 42 U.S.C. § 1983 (2006) for violations of his rights under the Fourteenth Amendment to due process and equal protection of the laws. He makes similar claims under the Minnesota Constitution. He claims that Defendants conspired against him in violation of 42 U.S.C. § 1985 (2006). He asserts that Defendants violated Title VII of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, and the Minnesota Human Rights Act (MHRA). Finally, he asserts a claim against Defendants for intentional infliction of emotional distress. The case is before the Court on Defendants' Motion for Summary Judgment. For the reasons set forth below, the Court grants Defendants' motion.

# I. BACKGROUND

In 2002 and 2003, McDonald worked for the City as the Director of the Office of Affirmative Action and the Coordinator of Minority Business Development and Retention. In 2003, after the termination of his employment, McDonald brought a lawsuit against the City and city officials. In 2004, the parties executed a settlement agreement in which the parties agreed that "this settlement agreement and release of all claims shall not constitute an admission of liability by any of the released parties."

In 2007, the City audited its administrative application of federal, state, and local laws designed to maximize economic inclusion. Based on the audit's recommendations, the City developed an implementation plan that recommended the creation of a Department of Human Rights and Equal Economic Opportunity. In a Resolution adopted in August 2008, the City appointed several individuals, including City Councilmember Melvin Carter, III, to serve on the Department of Human Rights and Equal Economic Opportunity Director Selection Committee. The Resolution's prefatory statements indicated that "the City should engage in a community process in order to select a director for the newly formed Department of Human Rights and Equal Economic Opportunity" and that "the City Attorney Office also recommends that Council shall appoint a committee led by Councilmember Carter to oversee said community process and recommend to the Mayor a list of finalists." Information about the creation of the department and the process to select its director appeared in a statement on the City's website. The statement indicated that the Mayor and City Council had appointed a selection committee; that "[t]he 12-member committee is charged with hosting a series of community meetings to engage the public and advising Human Resources on the recruitment, screening and selection of the best possible candidate"; that "New and Amended Ordinances will be proposed in the fall to support

2

the departmental framework"; that the City hoped to have a director in place by January 2009; and that "[t]he new director will serve 3-year terms at the recommendation of the mayor and will be vetted through a community selection process similar to that for the City's police and fire chiefs."[1] In October 2008, the City adopted an ordinance that created the Department of Human Rights and Equal Economic Opportunity. The ordinance provides that "[t]he director shall be appointed by the mayor with the approval of the council."

---

[1] Chapter 12 of the Saint Paul City Charter sets forth the procedures used to select the police and fire chiefs. The council establishes and appoints an examining committee:

> To examine eligibles for appointment to the offices of chief of police and fire chief, the council, upon notification from the mayor of the existence of a vacancy in any of said offices and after establishing minimum qualifications, shall establish and appoint an examining committee for each respective title with membership as provided by ordinance.

Saint Paul, Minn., City Charter § 12.12.1 (amended 2009). The committee tests the relative fitness of candidates, grades candidates, and certifies the five best candidates to the mayor:

> Each respective committee shall provide for competitive examinations to test the relative fitness of candidates, the grading of candidates, and the certification to the mayor of the five (5) best qualified candidates. The examining committee shall give notice of examinations in the same manner as required in examinations for filling vacancies in the classified service. The council shall provide for the payment of reasonable and necessary expenses of the committee and for staff help through the personnel director or otherwise as the mayor shall arrange.

*Id.* § 12.12.2 (amended 2009). Subject to the approval of the city council, the mayor appoints one of the certified candidates:

> Except as provided in [Section] 12.12.5, upon receiving from a qualifications and examining committee five (5) names, the mayor shall appoint one of said certified names, subject to the approval of city council. If the council does not approve the appointment, the mayor shall in turn appoint each of the remaining candidates, each subject to council approval. If the council approves none of the candidates, the candidate who has received the highest grading by the committee shall be appointed without further action by the mayor or council.

*Id.* § 12.12.3 (amended 2009).

In September 2008, McDonald applied for the position of Director of the Department of Human Rights and Equal Economic Opportunity. The selection committee received more than thirty applications for the position. After interviewing eight applicants, including McDonald, in November 2008, the selection committee certified three finalists: McDonald, Hope Jensen, and Lynn Littlejohn.

On December 9, 2008, the three finalists appeared at a community interview forum. According to McDonald, Councilmember Carter stated at the forum that one of the three would become the Director of the Department of Human Rights and Equal Economic Opportunity. Two days later, the Mayor and the Deputy Mayor interviewed McDonald. They also interviewed Jensen and Littlejohn. On December 24, 2008, the Deputy Mayor informed McDonald that the Mayor had decided to offer the Director position to one of the other finalists. The next day, McDonald thanked the Mayor and the Deputy Mayor for the opportunity to interview for the Director position, offered his assistance to ensure the success of the Department of Human Rights and Equal Economic Opportunity, and expressed his interest in future employment opportunities.

The Mayor offered the position to Jensen, who declined to accept it. The Mayor then offered the position to Littlejohn, who also declined to accept it. According to an interrogatory answer provided by Councilmember Carter, he and the Mayor spoke after December 31, 2008, and before January 5, 2009, about the dilemma of having only one viable finalist. The interrogatory answer described Councilmember Carter's decision to reconvene the selection committee:

> Since the Selection Committee's charge was to produce a slate of 3-5 candidates for the Mayor to choose from, Councilmember Carter determined the committee's work was yet incomplete and informed the Mayor's Office that, barring their objection, Councilmember Carter intended to reconvene the committee to

4

complete its work. Councilmember Carter then reconvened the Selection Committee.

The selection committee identified Paula Forbes, Luz Frias, and Sharon Garth as finalists. Forbes withdrew, and the committee certified Frias and Garth to the Mayor as finalists. Before the Mayor interviewed her, Garth withdrew. The Mayor and the Deputy Mayor interviewed Frias. In February 2009, the Mayor offered the Director position to Frias, she accepted, and the Council approved her appointment. In April 2009, McDonald brought this action.

## II.     DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A.     Due process**

McDonald claims that Defendants violated his right to due process under the U.S. Constitution and the Minnesota Constitution by failing to appoint him to the Director position after Jensen and Littlejohn had declined the Mayor's offer.[2] McDonald asserts violations of his

---

[2] "The due process protection provided under the Minnesota Constitution is identical to the due process guaranteed under the Constitution of the United States." *Sartori v. Harnischfeger Corp.*, 432 N.W.2d 448, 453 (Minn. 1988); *see Minneapolis Taxi Owners Coal., Inc. v. City of*

5

rights to procedural and substantive due process. *See Singleton v. Cecil*, 176 F.3d 419, 424 (8th Cir. 1999). "Analysis of either a procedural or substantive due process claim must begin with an examination of the interest allegedly violated." *Dover Elevator Co. v. Ark. State Univ.*, 64 F.3d 442, 445-46 (8th Cir. 1995). "The possession of a protected life, liberty or property interest is a condition precedent to the government's obligation to provide due process of law, and where no such interest exists, there can be no due process violation." *Dobrovolny v. Moore*, 126 F.3d 1111, 1113 (8th Cir. 1997).

In this case, McDonald asserts a property interest in the Director position. "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.*; *see Schueller v. Goddard*, 631 F.3d 460, 462-63 (8th Cir. 2011).

McDonald claims that he had a property right to the Director position after Jensen and Littlejohn declined the Mayor's offer. The Court discerns no such property interest. In the Resolution that named the selection committee, the prefatory statements indicated that "the City should engage in a community process in order to select a director" and that the committee was charged with overseeing the community process and recommending a list of finalists to the Mayor. The statement on the City's website indicated that "[t]he new director . . . will be vetted

---

*Minneapolis*, 572 F.3d 502, 510 (8th Cir. 2009), *cert. denied*, 130 S. Ct. 1570 (2010); *Ganley v. Minneapolis Park & Recreation Bd.*, 491 F.3d 743, 749 n.3 (8th Cir. 2007).

6

through a community process similar to that for the City's police and fire chiefs." The ordinance that created the Department of Human Rights and Equal Economic Opportunity provided that "[t]he director shall be appointed by the mayor with the approval of the council." The Mayor appointed the Director from finalists certified by the selection committee, but nothing in the resolution, the statement, or the ordinance bound Defendants to strictly apply section 12.12.3 of the City Charter, which governs the selection of the chief of police and the fire chief, to the Mayor's appointment of the Director.[3] Nothing in the resolution, the statement, or the ordinance precluded the selection committee from certifying additional finalists. And nothing in the resolution, the statement, or the ordinance precluded the Mayor from considering additional finalists certified by the selection committee.[4] Even if the Mayor was constrained to appoint from the initial three finalists, that the appointment was subject to the approval of the City Council deprives McDonald of a legitimate claim of entitlement to the Director position. *See Schueller*, 631 F.3d at 463.

Viewing the record in the light most favorable to McDonald, the Court concludes that he did not have a property interest in the Director position. The Court therefore grants Defendants summary judgment on McDonald's claims for violation of his right to due process.

---

[3] Councilmember Carter's alleged statement at the community forum that one of the three finalists certified at that time would become Director does not alter this conclusion. *See McMenemy v. City of Rochester*, 241 F.3d 279, 286 (2d Cir. 2001) ("Even if the Chief at one time intended to promote McMenemy and even if he expressed that intention as a promise, the City's broad discretion in matters of promotion, granted by statute, prevent that promise from ripening into an entitlement."). Subject to the City Council's approval, the authority to appoint the Director rested with the Mayor.

[4] At the motion hearing, McDonald stated that the selection committee's mandate expired upon its submission of the list of finalists to the Mayor. However, McDonald also stated that the Mayor could have requested additional finalists before, but not after, interviewing McDonald, Jensen, and Littlejohn.

**B.     Equal protection**

McDonald asserts that Defendants violated his right to equal protection of the laws under the U.S. Constitution and the Minnesota Constitution.[5] In the Complaint, he alleged that Defendants had violated his right to equal protection "because of his engagement in protected activity," i.e., his 2003 lawsuit against the City and city officials. Defendants contend that McDonald has no evidence that "he was passed over for the Director position because of his 2003 lawsuit." In response, McDonald notes that individuals involved in the selection of the Director were on the City Council or employed by the City in 2003. One member of the selection committee recused herself from McDonald's interview and the committee's discussion of him; McDonald had filed a workplace conduct complaint against her during his employment with the City. Another member of the committee asked McDonald about the complaint during the November 2008 interview. Nevertheless, the selection committee certified McDonald as a finalist. There is no evidence that the Mayor's decision not to appoint McDonald was tainted by McDonald's lawsuit against the City and city officials or by McDonald's workplace conduct complaint against the member of the selection committee years earlier. *See Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 986-87 (8th Cir. 2011).

In his interrogatory answers, McDonald asserted that Defendants had violated his right to equal protection by failing to appoint him the Director after Jensen and Littlejohn had declined the Mayor's offer. As explained above, Defendants were not bound to apply section 12.12.3 of

---

[5]     "Equal protection is an inherent but unenumerated right found and confirmed in Minnesota's state constitution." *Studor, Inc. v. State*, 781 N.W.2d 403, 408 (Minn. Ct. App. 2010).

the City Charter to the selection of the Director. The Court grants Defendants summary judgment on McDonald's claims for violation of his right to equal protection of the laws.[6]

**C. Conspiracy**

In the Complaint, McDonald claims that Defendants violated 42 U.S.C. § 1985 by "conspir[ing] to deny [him] an employment opportunity with a public institution because of his engagement in protected activity." Asked for the factual basis of his conspiracy claim, McDonald asserted in an interrogatory answer that the Mayor did not appoint him "because of the work place conduct complaint [McDonald] had filed against the city."

Under § 1985(3), a plaintiff must demonstrate: (1) a conspiracy; (2) that the purpose of the conspiracy was to deprive the plaintiff of the equal protection of the laws or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to a person or property, or the deprivation of a legal right. *Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971); *Federer v. Gephardt*, 363 F.3d 754, 757-58 (8th Cir. 2004); *City of*

---

[6] The Court notes that the Supreme Court has addressed "whether a public employee can state a claim under the Equal Protection Clause by alleging that she was arbitrarily treated differently from other similarly situated employees, with no assertion that the different treatment was based on the employee's membership in any particular class." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 594 (2008). The Supreme Court held that "such a 'class-of-one' theory of equal protection has no place in the public employment context." *Id.* The Court also notes that at least one circuit has stated that a policy of blacklisting employees who challenge personnel decisions may give rise to a cause of action under federal or state statutes but not one for violation of the Equal Protection Clause:

> A policy of blacklisting all employees who have challenged personnel decisions will often run afoul of state or federal laws that prohibit employers from retaliating against employees who exercise certain statutory rights. In such circumstances, however, the proper claim is not an equal protection claim brought in federal court, but a claim under the applicable anti-retaliation law brought in the forum designated to redress such harm. The mere illegality of a retaliatory action under a separate body of law does not make the resulting classification so illegitimate, irrational, or arbitrary as to violate the Equal Protection Clause.

*Teigen v. Renfrow*, 511 F.3d 1072, 1085-86 (10th Cir. 2007).

*Omaha Emps. Betterment Ass'n v. City of Omaha*, 883 F.2d 650, 652 (8th Cir. 1989). "The 'purpose' element of the conspiracy requires that the plaintiff prove a class-based 'invidiously discriminatory animus.'" *City of Omaha Emps. Betterment Ass'n*, 883 F.2d at 652 (quoting *Griffin*, 403 U.S. at 102 & n.10); *see Federer*, 363 F.3d at 758 & n.3. Defendants assert that McDonald's "allegations of a conspiracy are bald and conclusory" and that "[t]here are no facts in the record identifying the existence of an intent to violate [his] civil rights." McDonald's assertion that Defendants conspired against him to deprive him of the Director position because of his previous complaint against the City does not demonstrate a class-based invidiously discriminatory animus. *See Bryant v. Military Dep't of Miss.*, 597 F.3d 678, 687 (5th Cir.), *cert. denied*, 131 S. Ct. 287 (2010); *Childree v. UAP/GA AG CHEM, Inc.*, 92 F.3d 1140, 1147 (11th Cir. 1996); *Hicks v. Resolution Trust Corp.*, 970 F.2d 378, 382 (7th Cir. 1992); *Garrie v. James L. Gray, Inc.*, 912 F.2d 808, 813 (5th Cir. 1990); *Buschi v. Kirven*, 775 F.2d 1240, 1258 (4th Cir. 1985); *Kimble v. D. J. McDuffy, Inc.*, 648 F.2d 340, 347 (5th Cir. 1981); *Jacobson v. Indus. Found. of Permian Basin*, 456 F.2d 258, 259 (5th Cir. 1972) (per curiam). The Court grants Defendants summary judgment on McDonald's § 1985(3) claim.

**D.     Title VII and MHRA**

*1.     Retaliation*

In the Complaint, McDonald alleges that Defendants violated Title VII by "den[ying] and interfer[ing] with [his] attempt to avail himself to and benefit from an employment opportunity with a public institution because of his engagement in protected activity" and by "retaliat[ing] against [him] because [he] is an individual who engaged in protected activity." *See* 42 U.S.C. § 2000e-3(a) (2006). McDonald also alleges that Defendants violated the MHRA by "intentionally engag[ing] in a reprisal against [him] because [he] had asserted his rights

previously under [the MHRA]." *See* Minn. Stat. § 363A.15 (2010). Asked for the factual basis of these claims, McDonald asserted in interrogatory answers that he was not appointed to the Director position "after the other two finalists had turned down the mayor's appointment because he had made a charge that the city was not complying with state and federal equal employment opportunity laws."

The parties analyze McDonald's retaliation claims under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, a plaintiff must first establish a prima facie case of retaliation. *See Macias Soto v. Core-Mark Int'l, Inc.*, 521 F.3d 837, 841 (8th Cir. 2008); *Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 502 (8th Cir. 2005). If the plaintiff presents a prima facie case of retaliation, then the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the alleged adverse action. *See Macias Soto*, 521 F.3d at 841; *Kasper*, 425 F.3d at 502. If the defendant satisfies its burden, then the plaintiff must demonstrate that the stated reason is a pretext for retaliation. *See Macias Soto*, 521 F.3d at 841; *Kasper*, 425 F.3d at 502.

"To make out a prima facie case of retaliation, [a plaintiff] must show: (1) [he] engaged in protected conduct; (2) reasonable employees would have found the challenged retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct." *Weger v. City of Ladue*, 500 F.3d 710, 726 (8th Cir. 2007). "A materially adverse action is one that would have 'dissuaded a reasonable worker from making or supporting a claim of discrimination.'" *Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 722 (8th Cir. 2008) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

Defendants contend that McDonald cannot demonstrate a prima facie case. As noted above, there is no evidence that the Mayor's decision not to appoint McDonald was tainted by

11

McDonald's past lawsuit against the City and city officials. Because McDonald has not demonstrated a prima facie case of retaliation, the Court grants Defendants summary judgment on his retaliation claims under Title VII and the MHRA.[7]

### 2. *Aiding and abetting*

Defendants assert that McDonald "has provided no evidence that any person intentionally aided, abetted, incited, compelled or coerced a person to engage in any practice forbidden by the [MHRA]." *See* Minn. Stat. § 363A.14(1) (2010). McDonald asserts that there is a genuine issue of material fact as to whether the Mayor "aided and abetted or [c]oerce[d] Councilmember Carter to [c]ircumvent the [p]rocess." McDonald concedes that "an underlying discrimination claim is a prerequisite to a claim of aiding and abetting discrimination." *See id.*; *Smith v. DataCard Corp.*, 9 F. Supp. 2d 1067, 1081 (D. Minn. 1998). Having concluded that summary judgment in Defendants' favor is appropriate on McDonald's underlying MHRA claims, the Court grants Defendants summary judgment on his aiding-and-abetting claim.

---

[7] In his memorandum in opposition to Defendants' motion, McDonald asserts that Defendants violated Title VII and the MHRA by discriminating against him on the basis of his gender. *See* 42 U.S.C. § 2000e-2(a)(1) (2006); Minn. Stat. § 363A.08, subd. 2 (2010). McDonald alleged that he had "filed a charge of retaliation against Defendants with the Equal Employment Opportunity Commission," and the quotations from the Complaint and McDonald's interrogatory answers reveal that McDonald did not plead these claims. The Court declines to consider them. *See Rodgers v. City of Des Moines*, 435 F.3d 904, 909-10 (8th Cir. 2006) (stating that "the district court properly refused to consider unpled allegations"); *N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1057 (8th Cir. 2004) ("[W]hile we recognize that the pleading requirements under the Federal Rules are relatively permissive, they do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment."). Even if the claims are properly before the Court, the evidence on which McDonald relies—the gender of the finalists identified by the selection committee, the departure of two African-American males who headed departments during the previous administration, and his testimony about the Mayor's appointments—does not give rise to an inference that Defendants discriminated against him on the basis of his gender. *See Tyler*, 628 F.3d at 990.

### E. Title IX

In his Complaint, McDonald alleges that Defendants violated Title IX by "discriminat[ing] against [him] and . . . den[ying] and interfer[ing] with his attempts to participate in and avail himself to the benefits of a federally financed public institution because of his engagement in protected activity." Defendants assert that summary judgment is appropriate on McDonald's claim under Title IX because the Mayor's appointment of the Director is not an education program or activity that receives federal financial assistance. *See* 20 U.S.C. § 1681(a) (2006); *Roubideaux v. N.D. Dep't of Corr. & Rehab.*, 570 F.3d 966, 976-77 (8th Cir. 2009). McDonald does not direct the Court to any evidence that raises a genuine issue of material fact as to whether the Mayor's appointment of the Director falls within the scope of Title IX. The Court grants Defendants summary judgment on McDonald's Title IX claim.

### F. Intentional infliction of emotional distress

McDonald asserts a claim against Defendants for intentional infliction of emotional distress against Defendants. The claim requires a plaintiff to prove four elements: (1) the conduct must be extreme and outrageous; (2) it must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe. *Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 864 (Minn. 2003); *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 438-39 (Minn. 1983). Defendants assert that McDonald cannot demonstrate any of the elements.

The Minnesota Supreme Court has "cautioned that intentional infliction of emotional distress is 'sharply limited to cases involving particularly egregious facts' and that a 'high threshold standard of proof' is required to submit the claim to a jury." *Langeslag*, 664 N.W.2d at 864 (quoting *Hubbard*, 330 N.W.2d at 439). "Conduct is 'extreme and outrageous' when it is 'so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized

community.'" *Id.* at 865 (quoting *Hubbard*, 330 N.W.2d at 439). In this case, the selection committee received more than thirty applications for the Director position. After interviewing eight applicants, it certified three finalists. The three finalists participated in a community forum, the Mayor and the Deputy Mayor interviewed them, and the Mayor made offers to two of the three. The offers were declined. Additional finalists were identified and certified. The Mayor and the Deputy Mayor interviewed one of the additional finalists. The Mayor offered the position to the additional finalist, she accepted, and the City Council approved her appointment. Viewing the record in the light most favorable to McDonald, the Court concludes that the Mayor's decision not to offer the Director position to McDonald falls far short of the extreme and outrageous conduct necessary to support a claim of intentional infliction of emotional distress. The Court grants Defendants summary judgment on McDonald's claim for intentional infliction of emotional distress.

### III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Defendants' Motion for Summary Judgment [Docket No. 25] is GRANTED.

2. This action is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: May 12, 2011

s/ Joan N. Ericksen<br>
JOAN N. ERICKSEN<br>
United States District Judge